**LIQUID ASPHALT SYSTEMS, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 78–0616–CV–W–9.**

United States District Court, W.D. Missouri, W.D.

Nov. 23, 1982.

James Kapp, Spencer, Fane, Britt & Browne, Kansas City, Mo., for plaintiff.

Scott Nebergall, Trial Atty., Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

BARTLETT, District Judge.

This is a civil action against the United States of America for recovery of manufacturer's excise tax under Section 4061(a)(1) of the Internal Revenue Code of 1954, as amended, 26 U.S.C. § 4061(a)(1). Plaintiff alleges the taxes, penalties and interest at issue were erroneously paid, or erroneously or illegally assessed and collected. Plaintiff also seeks recovery of attorney's fees under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. The case was tried to the Court on September 27–28, 1982.

The Court has considered the testimony adduced at trial, the exhibits introduced into evidence, the briefs and arguments of the parties and the applicable law, and issues this Memorandum and Order in accordance with Federal Rules of Civil Procedure 52(a).

The plaintiff is Liquid Asphalt Systems, Inc., a corporation organized and existing under the laws of the State of Missouri. It was formed in 1973 and its president since incorporation has been Melvin D. Stevenson. During all relevant periods, plaintiff's principal place of business has been located at 2425 Jefferson, Kansas City, Missouri, within the Western District of Missouri. Since the second quarter of 1973, plaintiff has been manufacturing and selling asphalt-handling systems for the roofing industry.

Plaintiff manufactures four variations of asphalt-handling systems: (1) truck-mounted job tanks, (2) trailer-mounted job tanks, (3) mobile storage units, and (4) yard storage units. The Commissioner of Internal Revenue assessed manufacturer's excise tax only on certain truck-mounted and trailer-mounted models. The truck-mounted models were designated JTK6, JTK7, JTK12, JTK13, JTK15, JTK20; the trailer-mounted models were designated JTR3 and JTR6.[1]

Liquid Asphalt seeks recovery of $73,430.59 in manufacturer's excise tax, penalties and interest paid to defendant for the calendar quarters ending June 30, 1973, through December 31, 1975, inclusive, together with interest, costs, expenses and attorneys' fees. The total amount of excise tax paid by the plaintiff for the years 1973, 1974, and 1975 was $64,593.80. Of this amount, $55,066.95 were charged to and collected from the ultimate purchasers of the products. The remaining $9,526.85 plus $8,836.79 in interest and penalties were paid directly by the plaintiff and were not assessed to or collected from the ultimate purchasers.

Plaintiff has agreed to refund to its customers any excise taxes recovered as a result of this action to the extent that the tax was collected from its customers. Most of the ultimate purchasers of plaintiff's job tankers who paid the tax have consented in writing to the making of a refund. Therefore, plaintiff can claim in this action a refund for the tax imposed on those sales as well as the tax paid by it. 26 U.S.C. § 6416(a)(1)(D).

■ The Court has jurisdiction over the parties and the subject matter of this suit pursuant to 28 U.S.C. § 1346(a)(1) and

---

1. The numerals in the model numbers designate the ton capacity of the unit. The terms "job tanker" or "job tank" will, at times, be used by the Court to refer to both the truck and trailer-mounted job tanks when in the context of the sentence, the word encompasses both models.

plaintiff has complied with the requirements of 26 U.S.C. § 7422. In a tax refund suit, the assessments made by the Internal Revenue Service have a presumption of correctness. *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933). The taxpayer must prove by a preponderance of the evidence both that it has overpaid tax and the amount of the overpayment. *Helvering v. Taylor,* 293 U.S. 507, 514, 55 S.Ct. 287, 290, 79 L.Ed. 623 (1935); *United States v. Janis,* 428 U.S. 433, 440, 96 S.Ct. 3021, 3025, 49 L.Ed.2d 1046 (1976). The taxpayer has both the burden of going forward with the evidence and the burden of ultimate persuasion. *Laurel Hill Cemetery Association v. United States,* 427 F.Supp. 679, 686 (E.D.Mo.1977), aff'd, 566 F.2d 630 (8th Cir. 1977); *Rosenberg v. United States,* 295 F.Supp. 820, 822 (E.D.Mo.1969), aff'd, 422 F.2d 341 (8th Cir.1970).

The Court has previously granted summary judgment for the defendant on two constitutional claims made by the plaintiff. The remaining issues are:

1. Are the job tanks in question subject to the manufacturer's excise tax under Section 4061(a)(1)?

2. Are the machinery and equipment installed on these job tanks taxable under Section 4061(a)(1)?

Section 4061(a)(1) does not distinguish between highway and nonhighway vehicles. However, since 1956, the manufacturer's excise tax imposed by Section 4061(a)(1) has been diverted to the highway trust fund which provides funding for primary, secondary, and urban roads and the interstate highway system. H.R.Rep. No. 2022, 84th Cong., 2d Sess. 41–50 (1956); 1956–2 Cum. Bull. 1285, 1290–95. In recognition of this use for the proceeds of the manufacturer's excise tax, the Secretary of the Treasury has narrowed the scope of Section 4061(a)(1) by promulgating regulations which exempt from the tax vehicles not designed for highway use.

To resolve the issues in this case two sets of regulations must be interpreted and applied. During the period from April 4, 1973, to December 31, 1975, when the tax in question was allegedly incurred, regulations propounded in 1963 were in effect (hereinafter referred to as the "prior regulations"). See Treas.Reg. § 48.4061(a)–1 et seq. (1963), T.D. 6648, 1963–1 Cum.Bull. 197. In 1977 the regulations were revised (hereinafter "revised regulations"). See 26 C.F.R. § 48.-4061(a)–1, T.D. 7461, 1977–1 Cum.Bull. 317.

■ Treasury regulations must be upheld if they are found to implement the congressional mandate in some reasonable manner. *United States v. Cartwright,* 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973). This case does not involve a challenge to either the prior or revised regulations. The issues raised depend for their resolution on the interpretation and application of these regulations.

■ Exemptions from taxation are to be strictly construed and not easily expanded. *Heiner v. Colonial Trust Co.,* 275 U.S. 232, 235, 48 S.Ct. 65, 66, 72 L.Ed. 256 (1927); *Bingler v. Johnson,* 394 U.S. 741, 752, 89 S.Ct. 1439, 1445, 22 L.Ed.2d 695 (1969); *Commissioner v. Jacobson,* 336 U.S. 28, 49, 69 S.Ct. 358, 369, 93 L.Ed. 477 (1949).

The revised regulations apply retroactively. See 26 U.S.C. § 7805(b). However, the prior regulations can be applied if the taxpayer desires and if the prior regulations would "unequivocally resolve an issue involving the definition of a highway vehicle with respect to a period prior to such date . . . ." Section 48.4061(a)–1(d)(3). "Unequivocal" is defined in *Black's Law Dictionary* (5th ed. 1979) as "[c]lear; plain; capable of being understood in only one way, or as clearly demonstrated. Free from uncertainty, or without doubt . . . ."

■ The prior regulations provide that those vehicles "not designed for highway use" would be exempt from the tax and that trailers or semitrailers "primarily designed for highway use" would be subject to tax under Section 4061(a). Treas.Reg. § 48.4061(a)–1 (1963). Courts have utilized a two-step process to determine whether a vehicle is taxable under the prior regulations. First, courts have determined if the manufactured item was designed primarily

for highway use. If a primary design is evident, either for highway use or for purposes primarily or predominantly other than for the transportation of persons or property on the highway, the question of taxability is resolved. However, if a vehicle was designed both for transportation over the highway *and* for off-highway use, and no primary design was evident, the courts have then determined whether the designed highway use was merely incidental to the off-highway use. *Big Three Indus. Gas & Equip. Co. v. United States,* 329 F.Supp. 1273, 1277 (S.D.Tex.1971), aff'd, 459 F.2d 1042 (5th Cir.1972); *Frank Hrubetz Co. v. United States,* 412 F.Supp. 1033 (D.Or.1973), aff'd, 542 F.2d 512 (9th Cir. 1976); *Dillon Ranch Supply v. United States,* 652 F.2d 873, 879–81 (9th Cir.1981).

Plaintiff's job tankers are designed to provide roofing contractors with a more convenient and economical means of supplying hot liquid asphalt to the roofing job site than is available using the older "kettle system." Usually, the "kettle system" involved transporting cold asphalt in cartons and an asphalt kettle to the job site. The cartons of cold asphalt would then be broken open, and placed into the kettle for heating. When the asphalt reached application temperature it would be either hoisted or pumped to the roof for application.

Plaintiff's job tankers arrive at the site with large quantities of liquid asphalt which is then heated to application temperature and pumped to the roof. Ludwig Krchma, plaintiff's expert witness, testified that, in comparison to a kettle, plaintiff's job tanker are more sophisticated, bigger pieces of equipment with better temperature control. Also, because plaintiff's job tankers can carry liquid asphalt, they are more efficient—simultaneously delivering to the job site the materials and equipment necessary to build a roof.

Plaintiff's evidence clearly established that an important aspect of the design of these job tankers is to function as construction equipment on the job site. However, these job tankers are also designed to perform an important, not an incidental, high-

way transportation function. The job tankers were designed to transport liquid asphalt over the public streets and highways simultaneously with the other equipment necessary to prepare the asphalt for use in the roofing process. The tankers include as standard equipment lights, brakes, mudflaps and fenders. They require no special permit to be used on the highway and in fact are generally licensed as normal highway vehicles by the state. Some models may not be able to travel at regular highway speeds when fully loaded. Nevertheless, plaintiff advertises that its job tankers have a design and construction "keyed to productivity and portability." Defendant's Exhibit No. 1, Attachment A.

Motorized "portability" whether over the highways or at the job site is a significant feature of plaintiff's job tankers which makes them efficient and economical for roofing contractors. Melvin Stevenson, who designed the units and is president of plaintiff, testified that the job tankers would be less valuable to their customers without the ability to transport liquid asphalt to the job site.

Although design, not use, is controlling, *Dillon Ranch Supply v. United States,* 652 F.2d at 881, plaintiff's job tankers travel city streets and highways going to and from the job site loaded with liquid asphalt. Thomas Manson, a roofing contractor, testified that he used the trailer model job tankers to transport asphalt to the job site. If one of his tankers ran out of asphalt before a job was completed, more likely than not, it would be pulled to the supplier and refilled. Alternately, another job tanker might be rotated with the one at the job site or another job tanker brought to the site and liquid asphalt pumped from it into the empty one.

Although plaintiff established that from a use view point the job tankers spend significantly less time on the road than at the job site, the *designed* transportation function for the equipment is not merely incidental, but a vital part of the overall design of plaintiff's job tankers. Therefore, plaintiff's job tankers are taxable un-

der the prior regulations' primary design test.

Although it might be argued that the prior regulations resolve "unequivocally" the question of taxability, the application of the prior regulations is at plaintiff's option. Presumably plaintiff would not request application of the prior regulations if it knew that the conclusion was adverse to its position. Therefore, the revised regulations will be applied to the facts of this case to see if the result is different.

The revised regulations provide that any trailer or semitrailer designed to perform a function of transporting a load over the public highways is subject to the excise tax imposed by Section 4061(a)(1) whether or not it is also designed to perform some other function, unless it falls within three specified exceptions. *Dillon Ranch Supply,* 652 F.2d at 880.

Having already determined that plaintiff's job tankers are designed to perform a function of transporting a load over the public highways, the two exceptions which may be relevant in this case are those found in subsections (d)(2)(i) and (ii) of § 48.-4061(a)–1. Subsection (d)(2)(i) provides an exception for vehicles or trailers if it

(A) consists of a chassis to which there has been permanently mounted ... machinery or equipment to perform a construction [operation] ... if the operation of the machinery or equipment or equipment [sic] is unrelated to transportation on or off the public highways, (b) the chassis has been specially designed to serve only as a mobile carriage and mount ... for the particular machinery or equipment involved, whether or not such machinery or equipment is in operation, and (c) by reason of such special design, such chassis could not, without substantial structural modification, be used as a component of a vehicle designed to perform a function of transporting any load other than that particular machinery or equipment or similar machinery or equipment requiring such a specially designed chassis.

This exception applies to mobile equipment such as truck-mounted drilling rigs, construction cranes, and power shovels, where the operation of the equipment being transported has nothing to do with transportation on or off the public highways. Plaintiff's job tankers are not specially designed as a mobile carriage for machinery, the operation of which is "unrelated to transportation on or off the public highways." Also, plaintiff's job tankers are not "specially designed to serve *only* as a mobile carriage and mount ... for the particular machinery or equipment involved." Plaintiff's job tankers are designed to transport liquid asphalt over public highways to a job site where the liquid asphalt is dispensed as part of the roofing operation.

Treas.Reg. § 48.4061(a)–1(d)(2)(ii) provides an exception for vehicles

(A) specially designed for the primary function of transporting a particular type of load *other than over the public highway* in connection with a construction [operation] ... *and* (B) if by reason of such special design, the use of such vehicle to transport such load over the public highways is substantially limited or substantially impaired. (emphasis supplied.)

In applying this exception, account may be taken of such factors as whether the vehicle can travel at normal highway speeds, whether it requires special permission to use the highways, or whether it "is overweight, overheight or overwidth for regular use, and any other relevant considerations." *Id.*

As previously discussed, transporting a load over the public highways is an important part of the design and use of plaintiff's job tankers. Therefore, plaintiff's job tankers are not "specially designed for the primary function of transporting a particular type load other than over the public highways."

Even if one would reach a different conclusion with regard to part A of the (d)(2)(ii) exception, the use of plaintiff's job tankers to transport liquid asphalt over the public highways is not substantially impaired. Plaintiff's JTK15, if fully loaded,

would be overweight in all states and the JTK13 would be overweight in some states. Also, the job tankers when fully loaded cannot be driven safely faster than 40 miles per hour. Nevertheless, in response to the question of how far it was practical for a loaded job tanker to travel, Stevenson testified "around the world." Therefore, other than some limitation on speed when fully loaded, and in the case of two models possible weight problems when fully loaded, there is no other limitation or impairment in the transportation function of plaintiff's job tankers. Plaintiff's job tankers are not *substantially* limited or impaired in transporting loads over the public highways as the result of any special design. Accordingly, plaintiff's equipment meets the requirements of neither (A) nor (B) of subsection (d)(2)(ii).

Based on the foregoing, plaintiff's job tankers involved in this case are highway vehicles under both the prior and the revised regulations and subject to tax under Section 4061(a)(1).

██ Section 4061(a)(1) specifically provides for the taxation of "parts or accessories" sold on or in connection with a taxable body. Section 48.4061(a)–1(a)(3) of the revised regulations [2] provides as follows:

(3) *Equipment installed on chassis or bodies.* (i) For purposes of the tax imposed by section 4061(a)(1), *equipment or machinery installed on a taxable chassis or body is considered to be an integral part of the taxable chassis or body if the machinery or equipment contributes toward the highway transportation function of the chassis or body,* regardless of whether separate sales of the machinery or equipment would be subject to the tax on automotive parts or accessories imposed by section 4061(b). Therefore, the amount of the sale price of a taxable chassis or body that is attributable to such machinery or equipment must be included in the tax base when computing the tax due on a manufacturer's or importer's sale or use of a taxable chassis or body. Examples of the type of machinery or equipment that contribute to the highway transportation function of a chassis or body are the following: loading and unloading equipment; towing winches; and all other machinery or equipment contributing to either the maintenance or safety of the vehicle, the preservation of cargo (other than refrigeration units), or the comfort or convenience of the driver or passengers. (ii) *Amounts charged for machinery or equipment that is installed on a taxable chassis or body are not part of the taxable sale price of the chassis or body if (A) such machinery or equipment does not contribute toward the highway transportation function of the chassis or body* and (B) the reasonableness of the charge for the machinery or equipment is supportable by adequate records. Examples of such machinery or equipment are the following: equipment designed to spread materials on the highway; machinery or equipment used solely in the operation of mobile amusement rides; television equipment mounted in a mobile television studio; machine shop equipment mounted in a mobile machine shop; and car crushing equipment mounted on the chassis of a mobile car crusher. (emphasis supplied.)

In addition, § 48.4061(a)–1(b)(2) provides in pertinent part:

If an article subject to tax under section 4061(a) has equipment mounted thereon *to perform functions other than in connection with the transportation of persons or property,* no tax under section 4061(a) attaches to that part of the selling price of the completed unit which is reasonably attributable to such equipment provided such part of the selling price is billed separately on the invoice to the customer or can otherwise be estab-

---

**2.** The prior regulations taxed "parts or accessories ... sold on or in connection" with the sale of a taxable body. Section 4061(a)–1(a). In the case of trailers no tax was imposed on equipment "to perform functions other than in connection with the transportation of property or persons." Section 48.4061(a)-1(e)(1).

lished by adequate records.[3] (emphasis supplied.)

The standard equipment on job tankers is an inner tank or vat, insulation surrounding the inner tank or vat, a protective outer shell of rolled steel, a subframe, surge baffles, a heating system (consisting of fire and exhaust tubes, exhaust stacks and dampers, burners, controls, flame tube, various liquid propane hoses, regulators and gauges), a pumping system (consisting of a submerged gear pump, valving and internal piping, external piping, and a gasoline or liquid propane engine), a catwalk assembly, deck and ladder, manholes and covers, emission control system, engine cover, gauges, controls, draincock, running lights and bottle racks. Optional equipment includes semi-automatic and automatic controls, LPG engine conversion, fire extinguisher, propane tanks, auxiliary LPG engine conversion, starter generator package with remote control and tool box.

The outer shell and insulation provide protection to the inner tank or vat of the job tanker and also serve to retard heat loss from the asphalt both in route to and at the job site. Each tank is welded to a full-length subframe for added strength and support. Surge baffles are welded to the interior of the tank to form two or more separate compartments depending on the size of the job tank. These serve to prevent the load from shifting during transportation or if the job tanker gets lopsided at the job site. Each tank has a draincock which can be used to draw off the liquid asphalt. These features are designed to and do contribute to the highway transportation function of the chassis or body under Section 48.4061(a)–1(a)(3) and are therefore taxable.

The heating system (consisting of fire and exhaust tubes, exhaust stacks and dampers, burners, controls, flame tube, various liquid propane hoses, regulators and gauges) is primarily designed and used to heat the asphalt to the proper application temperature for use in the roofing process. The heating system is not used during the transportation of the asphalt to the job site. When loaded at the refinery or from the roofing contractor's yard storage facility, the liquid asphalt is warm enough to flow freely. Usually the liquid asphalt is transported in the job tanker to the job site before the heating system is activated. Occasionally the asphalt may be warmed at the contractor's yard before being transported to the job site if the asphalt is going to be needed at application temperature shortly after arrival. If this is done, it is not because the asphalt needs to be at any particular temperature to be transported, but solely because of the construction function. Asphalt is itself a preservative and is not perishable. Therefore, the heating equipment is not necessary to preserve the asphalt. The asphalt can be heated and melted innumerable times without losing its quality. It can, in fact, solidify in the job tankers without harm to either the asphalt or the job tanker. It is critical to the roofing process, however, that asphalt be heated to the proper temperature when it is applied to the roof. To properly perform its function as an adhesive and waterproofing material, the asphalt must be at the proper viscosity which depends on temperature. If the asphalt is either too hot or too cold the roofing material will not adhere and seal properly.

Roofing contractor Manson testified that because of the price of fuel, the heating system would not be used before it was needed to get the asphalt ready for application. Also, it is unsafe to operate the heating system while the job tanker is moving.

Therefore, the heating system is designed and used for the roofing process and does not contribute to the highway transportation function of the body or chassis. The heating system is not taxable.

---

**3.** The regulations pertaining to the equipment appear to apply a use test rather than a design test. Apparently, the Commissioner did not believe that the problems with a use test noted in *Dillon Ranch Supply*, 652 F.2d at 881, would occur with regard to the equipment. *Cf. Transairco v. United States*, 366 F.Supp. 602 (S.D. Ohio 1973) which predates the revised regulations.

The pumping system presents a more difficult problem. The pumping system (consisting of a submerged gear pump, valving and internal piping, external piping, and a gasoline or liquid propane engine), is built into the job tankers. The system is designed to and is generally used at the job site to pump the asphalt in small quantities to the roof as needed for application in the roofing process. A submerged gear pump aids the heating process by circulating the asphalt so that it heats evenly. The pumping system on plaintiff's job tankers can be controlled from the roof so that the proper quantity of asphalt can be delivered directly to the roof. The pumping system is also used at the job site to pump liquid asphalt from one job tanker to another when a tanker's supply has been exhausted and additional asphalt is needed.

Plaintiff argues that the pumping equipment is not taxable as unloading equipment because the liquid asphalt is not "unloaded" from the job tanker when it is pumped to the roof in small quantities even though eventually the load is dispensed entirely. Apparently, plaintiff believes the asphalt is "unloaded" only when it is dispensed completely on arrival at the job site as would occur with a conventional transporter.

The Government argues that Rev.Rul. 72–63, 1972–1 Cum.Bull. 333 is controlling. This revenue ruling was issued some years before the revised regulations and concludes that job tankers with equipment similar to plaintiff's are subject to tax. However, the ruling is very short and provides none of the reasoning underlying the conclusion that the equipment is taxable. The ruling does cite Rev.Rul. 69–206, 1969–1 Cum.Bull. 278, but that ruling held that "[i]tems of equipment installed on or sold with taxable tank bodies which are designed or adapted *solely* for the application of the products transported" are not subject to the tax. (Emphasis added.) This test for taxability of equipment was not included in the revised regulations. The revised regulations provide that machinery or equipment which "contributes toward the transportation function of the chassis or body" is taxable and "equipment . . . to

perform functions other than in connection with the transportation of persons or property" is not taxable. Treas.Regs. § 48.-4061(a)–1(a)(3) and (b)(2).

Recent revenue rulings have concluded that equipment which primarily performs a non-transportation function is not taxable. In Rev.Rul. 79–191, 1979–1 Cum.Bull. 338, which analyzes the taxability of certain pumping equipment, it was stated:

> The specially designed pumps and hoses that are integral parts thereof, and the stabilizing jacks perform an on-site function unrelated to transportation, *even though incidentally during the performance of this function the contents of the tanks and bins are unloaded.* Since this equipment *primarily performs a non-transportation function, it is not unloading equipment* within the meaning of subsection (i) of section 48.4061(a)–1(a)(3) of the regulations but is nontaxable under subsection (ii) of the regulation. (emphasis supplied.)

Rev.Rul. 79–192, 1979–1 Cum.Bull. 340, defined "contributes to the highway transportation" function as follows:

> An article "contributes" to the highway transportation or load-carrying function of a vehicle for purposes of the foregoing regulations only if it contributes as much or more to the highway transportation function than to the nontransportation function. In other words, *an item which contributes primarily to the nonhighway transportation function of the vehicle is not taxable.* (emphasis supplied.)

The pumping equipment on plaintiff's job tankers is *primarily* designed to perform and primarily performs a non-transportation function, i.e., delivering on demand from the tank small quantities of liquid asphalt at application temperature, even though incidentally during the performance of this function the asphalt is unloaded. Therefore, the pumping equipment is not taxable.

There are three manholes located on top of the tank. One has mounted on it the roof level pump control valve. Obviously

this manhole relates to the pumping mechanism previously determined to be nontaxable equipment. Therefore, this manhole and attached pump control valve is similarly nontaxable. The two other manholes are used for filling the tank and for an entry way in cleaning and maintaining the tank. These two manholes contribute primarily to the transportation function and are therefore taxable.

Access to these manholes is provided by the ladder, deck and catwalk assembly. Although the catwalk assembly is used as a convenient place to stand while attaching the piping from the roof to the pump control valve on the tank, the catwalk assembly also provides access to the manhole covers utilized for filling, cleaning, and maintaining the tank. Therefore, this equipment does not contribute primarily to the nonhighway transportation function and is accordingly taxable.

The engine cover is primarily a security-type device designed to protect the unit against vandalism. Manual controls and gauges are provided as standard equipment in order to regulate and maintain the heating and pumping systems. Bottle racks are included to transport 100-pound gas cylinders to the job site for use with the heating system. The emission control system controls pollution and does not aid the transportation of the asphalt. These items of equipment are not designed to and do not contribute to the highway transportation function of the chassis or body.

The tool box and optional equipment, including semi-automatic and automatic controls, LPG engine conversion, fire extinguisher, propane tanks, auxiliary generator and starter generator package with remote control, are used by plaintiff's customers at the job site. These items of equipment are not designed to and do not contribute to the highway transportation function of the chassis or body and are not taxable.

The running lights contribute to the highway transportation function of the vehicle in terms of safety and accordingly are taxable.

Having concluded that some of the machinery and equipment attached to the taxable job tankers is taxable and some is not, plaintiff must establish "that part of the selling price of the completed unit which is reasonably attributable to such equipment provided such part of the selling price is billed separately on the invoice to the customer or can otherwise be established by adequate records." § 48.4061(a)–1(b)(2). Larry Palmer, secretary-treasurer of plaintiff, testified that plaintiff's Exhibit 13, Appendix I, allocated the sales price of the job tankers in issue to the various items of standard equipment. Plaintiff's Exhibit 30 is the March 1, 1975 price list for the job tankers and optional equipment. The Government had no evidence to refute the price breakdown of the plaintiff. Therefore, plaintiff has established that part of the price of the completed job tankers which is reasonably attributable to the attached equipment.

For the reasons stated herein, the job tankers manufactured by plaintiff are subject to the manufacturer's excise tax under Section 4061(a)(1) of the Code. However, certain of the machinery and equipment installed thereon is subject to the tax and other machinery and equipment is not taxable.

Counsel are requested to confer and submit a proposed form of judgment consistent with this memorandum. In addition to setting forth that part of the selling price of each job tanker model reasonably attributable to equipment found nontaxable herein, the proposed form of judgment should allocate the total amount of taxes in dispute between taxable and nontaxable. Furthermore, consideration should be given to the effect of 26 U.S.C. § 6416(a)(1)(D) because plaintiff has not obtained written consents from all ultimate purchasers. See *Dillon Ranch Supply v. United States,* 652 F.2d at 874 n. 1. If counsel are unable to agree upon a form of judgment, plaintiff shall file its proposed judgment within 30 days from the date of this order. Defendant shall file its objections to plaintiff's proposed form of judgment within 14 days after plaintiff files its proposed form of judgment. With-

in thirty days from the date of this order, plaintiff may make application for fees and other expenses in accordance with 28 U.S.C. § 2412, if plaintiff believes that it can establish that the position of the United States was not justified.