**SCHLUMBERGER TECHNOLOGY CORPORATION AND SUBSIDIARIES, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 98–197T.**

United States Court of Federal Claims.

Jan. 31, 2003.

Joseph M. Persinger, New York City, for plaintiff. Daniel L. Penner, Fort Worth, TX, of counsel.

Elizabeth D. Seward, with whom were Eileen J. O'Connor, Assistant Attorney General, and Mildred L. Seidman, Chief, Court of Federal Claims Section, Tax Division, United States Department of Justice, Washington, DC, for defendant. William K. Drew, of counsel.

## OPINION

HEWITT, Judge.

Plaintiffs (collectively, Schlumberger or plaintiff) in this action seek recovery of taxes paid on diesel fuel by Schlumberger Technology Company and Subsidiaries and its former subsidiary, Dowell Schlumberger, Inc. (Dowell) for tax years 1991–94, plus allowable interest. Complaint ¶ 1. Plaintiff filed its Complaint on March 24, 1998, seeking recovery on taxes paid on diesel fuel consumed by a total of 1010 vehicles. Complaint *passim*; Preliminary Joint Stipulation of Facts

(Jt.Stip.) ¶ 11. Defendant has filed a counterclaim seeking recovery of refunds issued in 1997 for tax years 1992 and 1993. Jt. Stip. ¶ 9.

Before the court are the parties' cross-motions for partial summary judgment for the taxes paid on diesel fuel consumed by 530 of the 1010 vehicles.[1] Jt. Stip. ¶ 13; Motion of the United States for Partial Summary Judgment and Brief in Support Thereof (Def.'s Mot.) at 5; Reply in Support of Plaintiff's Cross Motion for Partial Summary Judgment (Pl.'s Reply) at 3–4. The motion has been fully briefed and argued.

The diesel fuel excise tax is imposed on "diesel-powered highway vehicle[s]" by § 4041(a)(1) of the Internal Revenue Code. 26 U.S.C. § 4041(a)(1) (1994). Treasury regulations provide a definition of "highway vehicle[s]," and several exceptions to the tax. Treas. Reg. § 48.4041–8(b) (1986). The two exceptions at issue here are those for "specially designed mobile machinery for non-transportation functions," Treas. Reg. § 48.4041–8(b)(2)(i), and for "vehicles specially designed for off-highway transportation." Treas. Reg. § 48.4041–8(b)(2)(ii).

Plaintiff argues that its vehicles are not "highway vehicles" under the Code, and therefore it should not be subject to taxation for the diesel fuel consumed by those vehicles. Opposition of Schlumberger Technology Corporation to Motion of United States for Summary Judgment and Cross Motion for Summary Judgment and Brief in Support Thereof (Pl.'s Opp.) at 20–46. Specifically, plaintiff argues that its vehicles meet all three prongs of the mobile machinery exception to "highway vehicle." *Id.* at 25–44. Additionally, plaintiff argues its sand dump trucks and conical cement transport trucks are exempt under the off-highway use exception. Pl.'s Reply at 24–26. Finally, plaintiff

argues that defendant has treated substantially similarly situated taxpayers who have similar mobile equipment differently, causing plaintiff to be put at a competitive disadvantage. Pl.'s Opp. at 47–49.

Defendant argues that plaintiff's vehicles meet neither exception to the taxes on diesel fuel consumed by highway vehicles. Defendant argues that plaintiffs' tractors, sand dump trucks, conical cement transport trucks, tank erector trucks, nitrogen pumper trucks, and various flatbed crane trucks are highway vehicles because they are designed to transport cargo over public roads to well sites. Def.'s Mot. at 12. Because the vehicles are designed to transport cargo over the public highways, defendant contends that those vehicles do not satisfy the mobile machinery exception to "highway vehicle." *Id.* at 13–23. Defendant also argues that the sand dump trucks and conical cement transport trucks do not satisfy the off-highway transportation exception to "highway vehicle" because they are not specially designed for the primary function of transportation of a load off-highway, and any special off-highway design does not substantially impair their use of the public roads. *Id.* at 23–30. Defendant also denies that its treatment of plaintiff in comparison to defendant's treatment of other taxpayers supports any claim for relief. Reply of the United States in Support of its Motion for Partial Summary Judgment and in Opposition to Plaintiff's Cross–Motion for Summary Judgment (Def.'s Reply) at 23–29.

For the following reasons, defendant's Motion for Partial Summary Judgment is GRANTED, and plaintiff's Cross–Motion for Partial Summary Judgment is DENIED.

## I. Background [2]

Plaintiff and its former subsidiary provide specialty services at well sites in the oil and

---

1. Plaintiffs original cross-motion for partial summary judgment included 768 vehicles. Opposition of Schlumberger Technology Corporation to Motion of United States for Summary Judgment and Cross Motion for Summary Judgment and Brief in Support Thereof (Pl.'s Opp.) at 8. Defendant moved to strike those issues beyond the parties' Joint Stipulation and, on August 30, 2002, the court granted that motion, limiting the summary judgment briefing to the 530 vehicles discussed in this opinion. *See* Order of August

30, 2002. In a prior opinion on defendant's motion for partial summary judgment the court held that the so-called "one claim" rule contained in I.R.C. § 6427(i)(1) did not bar plaintiff's claim for a credit under I.R.C. § 34 for diesel fuel taxes paid. *Schlumberger Tech. Corp. v. United States*, 47 Fed.Cl. 298, 300 (2000).

2. Many of the facts underlying this dispute have already been addressed in the court's prior opin-

gas exploration industry, using a fleet of diesel-powered vehicles. Jt. Stip. ¶ 1; Defendant's Proposed Findings of Uncontro-verted Fact (DPFUF) ¶ 1.[3] At issue here are 530 vehicles, grouped in the ten categories below:

| Dowell Prefix | Description | Approximate Number in Issue |
|---|---|---|
| 10F | Tractor with Compressor | 2 |
| 11C | Nitrogen Pumper Truck | 28 |
| 31A | Sand Dump Truck | 17 |
| 40A | Cement Transport Truck (Conical) | 39 |
| 52A | Tractor with Winch/Crane/Wetkit | |
| 52B | Tractor with Blower/Compressor | 383 (total 52A & B) |
| 53A | Stimulation Utility Truck (crane) | 14 |
| 54B | Crane/Iron Truck with Tank | 6 |
| 54C | Crane/Iron Truck without Tank | 24 |
| 58C | Tank Erector Truck (bin mover) | 17 |

Jt. Stip. ¶ 13. No special permits were required for any of the vehicles to operate on public roads, and all conformed to the applicable federal and state laws regarding height, weight, length, and width. *Id.* at ¶ 19. Generally, 80% of the mileage traveled by the vehicles was on public roads, with the remaining 20% on private roads, within a 200–mile radius of their home base. DPFUF ¶ 13; Plaintiff's Proposed Findings of Uncontroverted Fact (PPFUF) ¶ 15.

All vehicles have been specially modified for plaintiff. Work-performing equipment is bolted or welded to the chassis of the trucks and tractors, Jt. Stip. ¶ 14, and the chassis themselves have been modified as well. According to plaintiff, each truck or tractor chassis is ordered with most of the following specifications:

(1) Full length inverted "L", or double "C", channel frame reinforcement;

(2) Heavy duty spoke wheels;

(3) Front tow hooks;

(4) Low rear end gear ratio;

(5) Walking beam rear suspension on most units;

(6) Front frame extension for hydraulic pumps;

(7) Four wheel or all wheel drive on some units;

(8) Larger capacity straight I beam front axle than would be commonly found on th[e same] size chassis;

(9) Engine horse power 100 hp less than commonly found on th[e same] size chassis;

(10) Very specific CF (rear of cab to end frame) AF (center of rear axle or bogie to end of frame) dimensions which would not be suitable for dump truck or maximum payload application;

(11) Specific locations of battery boxes, air tanks, and fuel tanks;

(12) Special operating programs in engine computers for remote controls, and special programs in automatic transmission for remote controls in newer units, or for older units, special modifications to mechanical remote controls;

(13) Many chassis ordered with special transfer cases, 0 degree engine mounting angle, requiring different mounting brackets, fan shrouds, dip stick, exhaust system, air intake system, transmission rear mount, and drive line system;

(14) Heavy duty front spring brackets;

(15) Additional parking brake chambers;

(16) Many chassis ordered with larger air tanks [than commonly found on the same size chassis];

(17) Larger non-standard fuel tanks;

(18) Channel style rim spacers;

(19) Inner reinforcement at bogie area;

(20) Duplex front tires, and special on-off highway rear tires;

ion, and are not repeated here. *See Schlumberger Tech. Corp.,* 47 Fed.Cl. at 298–300.

3. Facts relied on in this opinion and cited to only one of the parties' Proposed Findings of Uncontroverted Fact or other filings do not appear to be in dispute.

(21) Dual mode transmissions, and variable speed engine governors;

(22) Heavy duty U joints and drive lines;

(23) Special front axle location;

(24) One or two extra rear lift axles;

(25) Pintle hook on certain body load chassis;

(26) Low mount stationary fifth wheel on certain tractor chassis;

(27) Longer than normal wheelbase; and

(29) Special automatic transmission.

Pl.'s Opp. at 13–15.

The equipment installer then further modifies the chassis of the vehicle before installing the operating equipment by installing the following:

(1) Reinforced sub frames consisting of a box-like structure with longitudinal cross members and certain portions of the hydraulic system used to operate the equipment built inside .... The subframes serve as the bases on which the equipment is mounted;

(2) Outriggers in a number of cases are required for stabilizing the unit when equipment is in operation ....

(3) Winch, where required, attached to the chassis frame, to the rear of the cab, by bolting and/or welding;

(4) Heavy duty power take off or transfer case in most cases which operate the equipment;

(5) Heavy duty front and/or rear bumpers in most cases. Such bumpers operate as front or rear frame cross members;

(6) Rear cross member (not necessary where heavy duty rear bumper is installed);

(7) Dust shields (on brakes to prevent entry of dust and debris);

(8) Remote engine throttle controls;

(9) Hydraulic system for operation of equipment;

(10) Compression plates (installed between subframe and frame);

(11) Barstock leveling of frame;

(12) Headache rack on many units .... and

(13) Various mounting brackets.

*Id.* at 15–16. These modifications result in an asymmetric configuration so that a flat surface could not be put on top of the chassis without additional modifications to level the chassis. *Id.* at 16.

Tractors with a winch, crane, wet kit, blower, or compressor are all highway-rated tractors manufactured by Peterbilt, primarily models 362 and 378. Def.'s Mot. at 6; Pl.'s Reply at 6. The tractors are capable of transporting a load at a speed of 65 miles per hour. Def.'s Mot. at 6. Tractors with winches have a heavy duty winch permanently mounted by subframe to the rear of the cab, and are primarily used to transport and position sand or frac fluid bins at the well site. Pl.'s Reply at 6. Tractors with cranes are primarily used to maneuver heavy components such as connecting pipe and fittings into place. *Id.* Tractors with wet kits have a heavy duty hydraulic pump and connections permanently mounted to the rear of the cab. *Id.* The wet kit on the tractors, driven by the tractor's road engine, is used to start a large diesel engine on the trailer. *Id.* Tractors with a blower or compressor have a permanently mounted blower or compressor attached to the tractor frame at the rear of the cab and are generally used with cement transport trailers to power the discharge of a load at the job site. *Id.* All tractors are coupled to trailers through the use of a fifth wheel. *Id.* at 6–7.

Sand dump trucks consist of covered two- or three-compartment sand bodies permanently mounted on a Peterbilt Model 357 highway-rated truck chassis. Def.'s Mot. at 7; Pl.'s Reply at 5. The truck is capable of transporting a load at a speed of 55 miles per hour. Def.'s Mot. at 7. The load is discharged at the job site by raising the forward end and gravity feeding the rear discharge device, allowing different grades of sand to be mixed at the well site. Pl.'s Reply at 5.

Conical cement transport trucks consist of two cone cement tanks permanently mounted on a Peterbilt Model 357 highway-rated truck chassis. Def.'s Mot. at 7; Pl.'s Reply at 5. The truck is capable of traveling at a speed of 55 miles per hour. Def.'s Mot. at 7. The tanks are discharged at the job site by use of a compressor or blower permanently

attached to and powered by the road engine of the chassis. Pl.'s Reply at 5–6.

Tank erector trucks consist of tank erector equipment mounted on a Peterbilt Model 357 highway rated truck chassis. Def.'s Mot. at 8; Pl.'s Reply at 8. Plaintiff specifies a speed limit of 65 miles per hour for these trucks. Def.'s Mot. at 8. The field storage bin on the trucks travels horizontally to the job site empty, then is picked up by the equipment on the vehicle and properly positioned to be filled with bulk cement. Pl.'s Reply at 8.

Nitrogen pumper trucks consist of a liquid nitrogen storage tank and pumping equipment mounted on a Peterbilt Model 362 highway-rated truck chassis. Def.'s Mot. at 8; Pl.'s Reply at 4. Highway-rated tires are used on the truck. Def.'s Mot. at 8; DPFUF ¶ 21. Plaintiff specifies a speed limit of 65 miles per hour for the truck. Def.'s Mot. at 8. For many jobs, the amount of nitrogen carried by the truck is insufficient and must be supplemented by a tanker trailer. Pl.'s Reply at 4–5.

Crane or iron trucks with or without tank consist of a flatbed body and crane permanently mounted on a Peterbilt Model 357 highway-rated truck chassis. Def.'s Mot. at 9; Pl.'s Reply at 7. Plaintiff specifies a speed limit of 65 miles per hour for these trucks. Def.'s Mot. at 9. Some of these trucks have pipe racks to carry connecting pipe and fittings to be used at the job site or tanks to carry well stimulation fluids to be used at the job site. Pl.'s Reply at 7.

Stimulation utility trucks consist of a flatbed body and crane permanently mounted on a Peterbilt Model 357 highway-rated truck chassis. Def.'s Mot. at 9; Pl.'s Reply at 7. Plaintiff specifies a speed limit of 65 miles per hour for these trucks. Def.'s Mot. at 9. None of the equipment, including the crane, can be used when the truck is in motion. Pl.'s Reply at 7. Some of these trucks have pipe racks to carry connecting pipes and fittings to be used at the job site or tanks to carry well stimulation fluids to be used at the site. *Id.*

## II. Discussion

### A. Summary Judgment

Summary judgment is warranted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rules of the United States Court of Federal Claims (RCFC) 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact that might significantly affect the outcome of the litigation is material. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Disputes over facts that are not outcome determinative will not preclude the entry of summary judgment. *Id.* at 247–48, 106 S.Ct. 2505.

The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the non-moving party to show that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed.Cir.1987). The movant is also entitled to summary judgment if the non-movant fails to make a showing sufficient to establish an element of its case on which it will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment. *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). When the case is before the court on cross-motions for summary judgment, each motion is evaluated under the same standard. *Cubic Defense Sys., Inc. v. United States*, 45 Fed.Cl. 450, 457 (1999).

### B. Highway Vehicle Excise Tax

Section 4041 imposes a tax on diesel fuel "sold by any person to an owner, lessee, or other operator of a diesel-powered highway vehicle ... for use as a fuel in such vehicle ... [, or] used by any person as a fuel in a diesel-powered highway vehicle ...." 26

U.S.C. § 4041(a)(1). Treasury regulations further define "highway vehicle" as:

[A]ny self-propelled vehicle, or any trailer or semi-trailer, designed to perform a function of transporting a load over highways, whether or not also designed to perform other functions, but does not include a vehicle described in paragraph (b)(2) of this section. For purposes of this definition, a vehicle consists of a chassis, or a chassis and a body if the vehicle has a body, but does not include the vehicle's load. Therefore, in determining whether a vehicle is a "highway vehicle", it is immaterial that the vehicle is designed to perform a highway transportation function for only a particular kind of load, ... except to the extent otherwise provided in paragraph (b)(2)(i) of this section, machinery or equipment specially designed to perform some off-highway task unrelated to highway transportation .... For purposes of paragraph (b) of this section, the term "transport" includes the term "tow".

Treas. Reg. § 48.4041–8(b). There are two exceptions to the definition of "highway vehicle." The first is the "mobile machinery" exception, Treas. Reg. § 48.4041–8(b)(2)(i), and second the "off-highway transportation" exception. Treas. Reg. § 48.4041–8(b)(2)(ii).

The parties' dispute centers on whether plaintiff's vehicles fall within one of the exceptions to the definition of highway vehicle. *See* Def.'s Mot. at 9; Pl.'s Opp. at 20. Therefore, the court turns to those two issues.

### 1. Mobile Machinery Exception

The mobile machinery exception is a three-part, conjunctive test. The regulation applicable to the case was adopted in 1977 and significantly altered the prior test. *See, e.g.,*

*W. Co. of N. Am. v. United States (Western Co.),* 699 F.2d 264, 267–68 (5th Cir.1983) (Prior test was whether vehicles were "primarily designed" or "predominantly adopted" for use as nonhighway vehicles). All three parts of the test must be satisfied for the exception to apply.[4]

The parties agree that part (A) of the mobile machinery exception is met if the equipment at issue is permanently mounted on the chassis of the vehicle and if its operation is unrelated to transportation. Def.'s Mot. at 15; Pl.'s Opp. at 26. Part (A) of the regulation provides, "A self-propelled vehicle ... is not a highway vehicle if it (A) consists of a chassis to which there has been permanently mounted (by welding, bolting, riveting, or other means) machinery or equipment to perform a construction, manufacturing, processing, farming, mining, drilling, timbering, or other operation similar to any one of the foregoing enumerated operations if the operation of the machinery or equipment is *unrelated to transportation* on or off the public highways ...." Treas. Reg. § 48.4041–8(b)(2)(i) (emphasis added).

The parties also agree that loading or unloading cargo is not "unrelated to transportation." Transcript of November 19, 2002 Oral Argument (Tr.) at 13–14, 45. Loading and unloading cargo is specifically addressed in Treas. Reg. § 48.4061(a)–1(a)(3)(i), which provides:

Examples of the type of machinery or equipment that contribute to the highway transportation function of a chassis or body are the following: loading and unloading equipment; towing winches; and all other machinery or equipment contributing either to the maintenance or safety of the vehicle, the preservation of cargo

---

**4.** "A self-propelled vehicle, or trailer or semi-trailer, is not a highway vehicle if it (A) consists of a chassis to which there has been permanently mounted (by welding, bolting, riveting, or other means) machinery or equipment to perform a construction, manufacturing, processing, farming, mining, drilling, timbering, or other operation similar to any one of the foregoing enumerated operations if the operation of the machinery or equipment is unrelated to transportation on or off the public highways, (B) the chassis has been specially designed to serve only as a mobile carriage and mount (and a power source, where applicable) for the particular machinery or equipment involved, whether or not such machinery or equipment is in operation, and (C) by reason of such special design, such chassis could not, without substantial structural modification, be used as a component of a vehicle designed to perform a function of transporting any load other than that particular machinery or equipment or similar machinery or equipment requiring such a specially designed chassis." Treas. Reg. 48.4041–8(b)(2)(i).

(other than refrigeration units), or the comfort or convenience of the driver or passengers.

Treas. Reg. § 48.4061(a)–1(a)(3)(i) (cited in Def.'s Mot. at 16–17).

Notwithstanding their agreement that loading and unloading cargo is not unrelated to transportation and despite the explanation contained in Treas. Reg. § 48.4061(a)–1(a)(3)(i), the parties dispute the meaning of the phrase "unrelated to transportation." Defendant contends that the equipment meets the part (A) test if it has *no* relation to functions related to transportation-such as loading or unloading cargo. *See* Def.'s Mot. at 16–17. Plaintiff argues that the test is met if the vehicles are "designed with the primary emphasis of efficient operation of the machinery at the well site, and getting the machinery to these sites in extremely difficult and rough conditions." Pl.'s Opp. at 26. Therefore, plaintiff argues that any loading and unloading such equipment may do, if not the primary function, should not defeat plaintiff's satisfaction of part (A) of the test. *See id.*

The court's task is to interpret the plain language of the regulation. The canons of statutory interpretation require the court to consider first the plain language of the statute and any binding authority interpreting the language. *See* 2A Norman J. Singer, *Sutherland Statutory Construction* § 46:01, at 113–129 (6th ed.2000); *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980) ("[T]he starting point for interpreting a statute is the language of the statute itself.").

Plaintiff has not pointed to any binding authority that would require the court to depart from a plain language interpretation as to part (A) of the exception. *See id.* Therefore, the court considers the text of the regulation itself. The text says simply that the mobile machinery must be "unrelated to transportation." Treas. Reg. § 48.4041–8(b)(2)(i). "Related" is commonly defined as "[b]eing connected; associated." *American Heritage Dictionary* 1473 (4th ed.2000). The requirement that something be "unrelated" would therefore appear to mean "without a connection" or "not connected." Neither party has cited any binding authority interpreting the phrase "unrelated to transportation" in the part (A) exception that accords with the court's view of the plain meaning of the phrase.

■ A revenue ruling did find that certain cranes met the part (A) test notwithstanding that cranes can be used in loading and unloading cargo. *See* Rev. Rul. 81–71, 1981–1 C.B. 496, 1981 WL 166106 (1981).[5] The court finds this revenue ruling to be unpersuasive, however. The revenue ruling explicitly states that the cranes in issue "provides access generally to construction areas that would otherwise require scaffolding and rigging ... [and] may also be used for utility work, firefighting, rescue operations, or anywhere an aerial platform is needed." *Id.*

---

**5.** Revenue Rulings and General Counsel Memoranda are entitled to some deference because these are the Internal Revenue Service's interpretation of its own regulations. *Spang Indus., Inc. v. United States,* 791 F.2d 906, 913 (Fed.Cir. 1986) (Revenue Rulings); *Am. Express Co. v. United States,* 262 F.3d 1376, 1384 (Fed.Cir. 2001) (General Counsel Memoranda). These interpretations do not have the force of law, however, because they have not been subject to notice and comment, and therefore are "beyond the *Chevron* pale." *Vons Cos. v. United States,* 51 Fed.Cl. 1, 8 n. 5 (2001) (quoting *United States v. Mead Corp.,* 533 U.S. 218, 121 S.Ct. 2164, 2175, 150 L.Ed.2d 292 (2001)). Thus, these interpretations only have the "power to persuade." *Id.* (citing *Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000)). By comparison, private letter rulings and technical advice memorandum "may not be used or cited as precedent." 26 U.S.C. § 6110(k)(3). This court has previously stated that "the plain language of [section 6110(k)(3)] clearly precludes a court from giving [private letter rulings and technical advice memorandum] *any* precedential weight." *Vons,* 51 Fed. Cl. at 10 n. 7. Private letter rulings and technical advice memoranda may be used in certain limited circumstances to show that the Commissioner abused his discretion. *See Int'l Bus. Machs. Corp. v. United States,* 170 Ct.Cl. 357, 343 F.2d 914, 924 (1965); *Vons,* 51 Fed. Cl. at 10 (Those limited circumstances involve situations where "two or more taxpayers in direct economic competition have each applied for a ruling and only one has received a favorable ruling; and ... the taxpayer denied the favorable ruling is arguing that the Commissioner abused his discretion under section 7805(b) by failing to apply a new legal position only prospectively.").

These cranes were highly specialized and designed with a purpose wholly unrelated to loading and unloading, and therefore satisfied the part (A) test. Revenue Ruling 81–71 does not bear on the court's analysis of the facts before it.

■ The court is not aware of any basis on which the phrase "unrelated to transportation" could be read to mean "not primarily related to transportation," as plaintiff urges. Pl.'s Opp. at 26. The regulation requires that the equipment permanently mounted on the chassis be equipment "unrelated" to transportation. In particular, a vehicle with permanently mounted equipment used in loading and unloading cargo does not meet the part (A) test.

The parties also disagree on the scope of part (B) of the mobile machinery exception. Part (B) provides, "[A self-propelled vehicle ... is not a highway vehicle if] (B) the chassis has been specially designed to serve *only* as a mobile carriage and mount (and power source, where applicable) for the particular machinery or equipment involved, whether or not such machinery or equipment is in operation ...." Treas. Reg. § 48.4041–8(b)(2)(i) (emphasis added). Defendant argues that "a vehicle's chassis must be designed to serve *only* as a mobile carriage for the job-site equipment" in order to qualify under part (B). Def.'s Mot. at 15. For defendant, "only" means "only." Any other use of the vehicle, such as cargo-hauling, defeats part (B) of the test. *See* Reply of the United States in Support of its Motion for Partial Summary Judgment and in Opposition to Plaintiff's Cross–Motion for Summary Judgment (Def.'s Reply) at 15.

Plaintiff argues that "only" should be construed to allow the application of the mobile machinery exception when the "special design" feature constitutes "substantial limitations to the [vehicle's] utility for any other application" than as a mobile carriage for the job-site equipment. Pl.'s Opp. at 27. Plaintiff contends that the word "only" must be interpreted using a "reasonableness" standard. *Id.* at 39. Any other interpretation, according to plaintiff, would be " 'hypertechnical', and unworkable." Pl.'s Reply at 20

(quoting *Utilicorp United, Inc. v. United States,* 21 Cl.Ct. 453, 467 (1990)).

■ To support its contention, plaintiff points to several private letter rulings and technical advice memoranda issued by the Internal Revenue Service to other taxpayers. *See* Pl.'s Opp. at 33–37. But it is clear that the private letter rulings to other taxpayers and technical advice memoranda "may not be used or cited as precedent." 26 U.S.C. § 6110(k)(3). Further, this court has made clear that such guidance only has precedential value as to the specific taxpayers to which they are issued. *Vons,* 51 Fed.Cl. at 9. Accordingly, the court finds that the private letter rulings and technical advice memoranda cited by plaintiff provide no support for its interpretation of "only."

Plaintiff also relies on cases decided by this and other trial courts to bolster its position. However, none of the cases it cites is binding on this court for the asserted proposition. *See* Pl.'s Opp. at 33–37; Pl.'s Reply at 16–24. While those cases may provide guidance to the court in analyzing certain of the vehicles at issue, they do not bind the court's interpretation of the regulation as a whole.

■ Defendant argues that plaintiff seeks, in effect, a return to the pre–1977 regulation, the "primary design" test, which is not applicable to this case. Def.'s Reply at 7. According to defendant, the language of the regulation applicable to this case leaves no room for flexibility; "only" must mean "only," and any cargo-hauling capacity results in the inapplicability of the exemption. *Id.* at 15–16. Based on the plain language of the applicable regulation, the court agrees with defendant.

■ The court does not believe, however, that it is necessary that designers eliminate any nooks and crannies where some cargo could conceivably be stashed. It is not necessary, for example, that there be no place for tools, clothing, and safety equipment. The court believes that vehicles which carry the foregoing and similar items as incidental cargo may nevertheless be deemed to qualify under part (B) of the exception under a "reasonableness" standard. But plaintiff's effort to return to the "primary design" test based on a "reasonableness" argument is not

supportable given the plain language of part (B) of the mobile machinery exception.

■ Finally, the parties disagree on the proper interpretation of part (C) of the mobile machinery exception. Part (C) of the regulation provides, "[A self-propelled vehicle . . . is not a highway vehicle if] (C) by reason of such special design, such chassis could not, without substantial structural modification, be used as a component of a vehicle designed to perform a function of transporting any load other than that particular machinery or equipment or similar machinery or equipment requiring such a specially designed chassis." Treas. Reg. § 48.4041–8(b)(2)(i).

Defendant argues that "the chassis must not be capable of transporting any load other than the work-performing equipment without substantial structural modification," thereby focusing on the cargo-hauling capacity of the vehicles. Def.'s Mot. at 15–16. Plaintiff focuses instead on the "substantial structural modification" portion of the test, arguing that any focus on the cargo-hauling capacity of the vehicle would merely duplicate part (B) of the exception. Pl.'s Reply at 15.

Plaintiff argues that defendant's interpretation of part (C) of the mobile machinery exception is "completely novel and inherently incorrect." Pl.'s Reply at 15. Specifically, plaintiff relies on the district court's interpretation of the current regulation in *Halliburton Co. v. United States,* 611 F.Supp. 1118 (N.D.Tex.1985), where the court stated:

> The new regulation must be read in realistic and practical terms. A proper inquiry should be whether a chassis could *reasonably* be used as a component of a highway vehicle . . . . Of course, given the necessary time, expertise and money, one of plaintiffs' chassis could be converted to another use. However, no one would reasonably do so when a suitable chassis for another application could be acquired from the manufacturer at considerable cost savings.

611 F.Supp. at 1129 (quoted in Pl.'s Opp. at 36–37). Plaintiff argues that this test-whether, as a reasonable business matter, one would choose to rework the chassis to carry other cargo-represents the proper interpretation of part (C), and should be used by the court here. *See* Pl.'s Reply at 15.

Defendant argues that "plaintiff's-and the district court's [in *Halliburton*]-description of the [p]art [(C)] test does not track the regulation and is overbroad . . . ." Def.'s Reply at 16. For defendant, the key question is whether substantial structural changes are needed to carry any other load, not whether a business person would choose to make whatever changes are necessary. *See* Tr. at 23.

The regulation states that "by reason of such special design [referred to in part (B) of the regulation], *such chassis could not, without substantial structural modification, be used as a component of a vehicle designed to perform a function of transporting any load other than* that particular machinery . . . requiring such a specially designed chassis." Treas. Reg. 48.4041–8(b)(2)(i)(C) (emphasis added).

The court notes that the language of part (C) of the mobile machinery exception effectively incorporates a portion of the part (B) test. Both tests relate to the capability of the vehicle to carry a load other than mobile machinery. If the vehicle is capable, without modification, of carrying a load in addition to the job-site equipment, the vehicle already fails the test under part (B). The part (C) test provides an additional requirement: that substantial structural modification be required for the vehicle to serve as a carrier for other cargo (assuming it does not already have the capacity to carry cargo and thereby fails part (B) of the test). Plaintiff's argument that the part (C) test addresses only "substantial structural modification," Pl.'s Reply at 15, appears to the court to ignore one of the two prongs of the part (C) test.[6]

6. Although the parties do not address the point, it appears to the court that a failure to meet the part (A) test could also result in a failure to meet the part (B) test. For example, the existence of chassis-mounted loading and unloading equipment not permitted under part (A) would also defeat the requirement in part (B) that "only" mobile machinery be mounted on the chassis. In at least some cases, a violation of part (A) is a subset of the possible violations of part (B). It would be consistent with the structure of the regulation for a violation of part (B) to be a subset of the possible violations of part (C).

Within the foregoing framework for analyzing the vehicles under the three-part test of the mobile machinery exception, the court now considers the several types of vehicles at issue.

a. Tractors

■ The tractors at issue in this case include tractors with winches, cranes, wet kits, hydraulic pumps, blowers or compressors. Jt. Stip. ¶ 13. Defendant has conceded that tractors with wet kits, hydraulic pumps, winches and wet kits, and wet kits and blowers satisfy part (A) of the mobile machinery exception.[7] The court therefore reviews whether the tractors with cranes, winches, compressors, or blowers satisfy part (A) of the test.

Defendant argues that the stated purpose of the crane, winch, compressor, or blower is to load or unload cargo, and that such equipment is not unrelated to highway transportation. Def.'s Mot. at 16. Defendant argues that the work-performing machinery is therefore not "unrelated to transportation on or off the highway," and accordingly part (A) of the mobile machinery exception is not met. Def.'s Mot. at 17.

Plaintiff argues that because the equipment in question is permanently mounted on the chassis and the vehicles "are designed with the primary emphasis of efficient operation of the machinery at the well site," part (A) of the mobile machinery exception is met. Pl.'s Opp. at 26.

The court agrees with defendant that tractors with winch, compressor, and blower do not meet part (A) of the mobile machinery exception. The documents contained in the parties' joint stipulation support this conclusion unequivocally. The winch is used "to load skid mounted units." Jt. Stip. Ex. 9 at 20. The blower "provides air to load dry bulk material, primarily sand and cement." *Id.* at 28. The compressor "provides air to load and unload dry bulk material, primarily

sand and cement." *Id.* at 32. Further, at oral argument, plaintiff was unable to point to a use of the winch, blower, or compressor that did not involve loading or unloading of cargo. Tr. at 50–51. Tractors with winch, compressor, and blower do not satisfy part (A) of the exception because loading and unloading cargo contributes to the transportation function of the tractors.

Plaintiff attempts to distinguish the tractors with crane. At oral argument, plaintiff posited that the cranes in fact are used to position equipment at the job site, a use that would not be related to a transportation function. Tr. at 51–52. Plaintiff's contention in this regard is supported by the affidavit of Charles J. Whitacre, which states that the cranes are used "to maneuver various heavy components such as connecting pipe and fittings into place." Appendix A to Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment and Cross Motion for Partial Summary Judgment (Pl.'s App.) at 4. However, the parties' joint stipulation states that the crane is used "to spot Tree savers and to load and unload large items." Jt. Stip. Ex. 9 at 18. Loading and unloading is a part of a transportation function. Treas. Reg. § 48.4061(a)–1(a)(3)(i). Notwithstanding plaintiff's effort to challenge its own joint stipulation, the court believes that plaintiff's stipulation has effectively conceded that the tractors with crane do not satisfy part (A) of the exception.

The court next addresses the tractors with respect to part (B) of the mobile machinery exception. Defendant's argument on this point is very simple; the tractors are designed to tow a trailer on its fifth wheel. Def.'s Mot. at 17–18. Because part (B) is limited to those vehicles whose load "consists *only* of permanently installed machinery," plaintiff's tractors do not satisfy the test. *Id.* at 18.

Plaintiff has attempted to meet part (B) by arguing that the tractors are "married" to

---

7. On November 25, 2002, defendant filed a motion for leave to file corrected pages of its motion for partial summary judgment to eliminate the concessions as to the winches and wet kits and the wet kits and blowers. The court sees no reason to grant this motion. Defendant made the concession on March 22, 2002, in its motion

for partial summary judgment. It did not attempt to correct this until late November, over eight months later, and after the court had pointed out this concession at oral argument. Tr. at 14–15. Because of this long delay, defendant's Motion for Leave to File Corrected Page of its Opening Brief is DENIED.

individual trailers, and therefore the tractor-trailer combination should be viewed as a whole. Pl.'s Reply at 6; Tr. at 41–42. Affidavits in the record refer to trailers that are "generally used" with certain tractors, and state that other trailers are "useless" without the specific tractor to power it. Pl.'s App. at 4–5, ¶ 4. Plaintiff contends that the tractors are modified to do a certain job with a certain trailer, and that the court should view the combination accordingly. Tr. at 44.

Plaintiff argues that the district court opinion in the *Halliburton* case supports its position that the tractor-trailer combination should be viewed as one unit for purposes of part (B) analysis. Pl.'s Reply at 14. In *Halliburton,* the district court initially mentions one of the types of vehicles at issue being "a tractor-trailer combination unit." 611 F.Supp. at 1119. However, the court immediately follows that statement with a listing of the various trucks and trailers in dispute, with no mention of any tractors. *Id.* at 1120.

Further, the case law and plain language of the regulations make clear that tractors and trailers are two distinct types of vehicles, and must be dealt with accordingly. Treasury regulations define a highway vehicle as "any self-propelled vehicle, or any trailer or semi-trailer." Treas. Reg. § 48.4041–8(b). The text of the mobile machinery exception also uses the disjunctive "or" to separate the category of self-propelled vehicles (which would include tractors) from the category of trailers. Treas. Reg. § 48.4041–8(b)(2)(ii). *Halliburton,* the case relied upon by plaintiff to support its contention that the tractor and trailer should be coupled, states that, for purposes of a mobile machinery exception analysis, "the chassis consist of four general major component groups—the frame, the drive system, the suspension system, and the cab." *Halliburton,* 611 F.Supp. at 1120. Similarly, this court found that the analysis of the application of the mobile machinery exception to a vehicle should be made after the special modifications have been made to the chassis, but before the job-site equipment was mounted. *Utilicorp,* 21 Cl.Ct. at 466. Given the clear language of the regulation and the consistent case law, the court sees no

reason to couple the tractor and trailer for purposes of this analysis.

Viewing the tractors independently of the trailers, it is clear that none meets the part (B) test. The cargo that can be hauled by these tractors is not incidental—the tractors have a fifth wheel that is designed to haul a trailer. The parties' joint stipulation highlights this, as the first application of every tractor in question is to "[t]ransport[ ] float equipment." Jt. Stip. Ex. 9 at 18, 20, 22, 24, 26, 28, 30, 32. Because the tractors do not "serve only as a mobile carriage and mount," Treas. Reg. § 48.4041–8(b)(2)(i)(B), they fail part (B) of the mobile machinery exception.

Even if the tractors in issue could meet the part (A) and (B) tests, they would still fail the part (C) test. Defendant's argument is once again very simple; that plaintiff's tractors are capable of transporting cargo without any structural modification, and therefore they do not meet the part (C) test. Def.'s Mot. at 18.

Plaintiff argues that its tractors need significant structural modifications before they can be "economically used as a component of a highway vehicle." Pl.'s Opp. at 40. According to plaintiff,

> In order to reasonably use [plaintiff's tractor] chassis as modified for any other transportation use, it would be necessary to remove all of the deck mounting members and brackets, the subframes and their mountings, the outriggers and their assemblies, headache racks, winches where installed, the extra rear lift axles, hydraulic systems, the larger non-standard fuel tanks, heavy duty front and rear bumpers, and add in-frame cross members where necessary. In addition, the front axle would have to be changed, battery boxes, air tanks and fuel tanks would have to be moved, the frame would probably have to be lengthened or shortened, and perhaps the wheelbase altered to accommodate the new application. If the wheelbase were altered, it would be necessary to remove and replace the driveline. Heavy-duty wheels, additional brake chambers, power take offs, and transfer cases would have to be removed. The rear axle gear ratio would probably have to be changed as well

because the low gear ratio would make any highway transportation not fuel-efficient. . . . Even with the foregoing alterations and removals, the truck chassis would still be heavier and more expensive because of the items which cannot be removed, e.g., transmission for remote controls, more expensive engine and transmission than necessary, unnecessary frame reinforcement, unusual front axle placement, zero (0) degree engine mount, heavy duty front spring brackets, dual mode transmissions, heavy duty U-joints, compression plates, bar stock for leveling of frame, and the like.

Pl.'s App. at 10, ¶ 19. All these modifications are necessary, plaintiff argues, because without them, the maximum fuel-efficient speed of the tractors is approximately 50 miles per hour in a part of the country where highway speeds of 70 to 80 miles per hour are the norm. *Id.* at ¶ 20.

But plaintiff does not point to text in the regulation which allows an exception for structural modifications required for the unit to serve economically as a highway vehicle. The regulation instead states that the vehicle "could not, without substantial structural modification, be used as a component of a vehicle designed to perform a function of transporting any load other than that particular machinery or equipment or similar machinery or equipment requiring such a specially designed chassis." Treas. Reg. § 48.4041–8(b)(2)(i)(C). While all the modifications enumerated by plaintiff may well be required for the tractor to serve economically as a highway vehicle, none is needed for the tractors to "be used as a component of a vehicle designed to perform a function of transport[ation]." *Id.* Therefore, none of the

tractors satisfies part (C) of the mobile machinery exception.[8]

Because none of plaintiff's tractors satisfies parts (B) or (C) of the mobile machinery exception and, in addition, because the tractors with cranes, winches, compressors, or blowers also fail to satisfy part (A) of the mobile machinery exception, the mobile machinery exception is not available. Summary judgment is accordingly GRANTED to defendant on this issue.

b. Sand Dump Trucks, Conical Cement Transport Trucks, and Tank Erector Trucks

■ Defendant argues that the sand dump trucks, conical cement transport trucks, and tank erector trucks do not meet part (A) of the mobile machinery exception because the conical cement tanks, sand compartments, and tank erector tilt beds and hydraulic arms present in the vehicles are related to transportation. Def.'s Mot. at 19–20.

Plaintiff argues that its vehicles do meet part (A) of the mobile machinery exception, appearing to rely on a blanket assertion in regard to the sand dump trucks and cement transport trucks. Pl.'s Opp. at 25. With respect to the tank erector trucks, plaintiff specifically asserts that "[their] primary function . . . is not transportation; it is the positioning of various items of equipment necessary for the services involved at the well site." *Id.* at 26.

It is clear to the court that both the sand dump trucks and cement transport trucks do not meet the part (A) test of the mobile machinery exception. The purpose of these trucks is to transport their load, *see* Jt. Stip. Ex. 9 at 4, 7, and therefore the mobile machinery exception is not available to them.

---

**8.** In analyzing whether a chassis would need substantial structural modification, one of the factors taken into consideration by the Internal Revenue Service has been whether the modifications resulted in an asymmetric configuration. *See* Rev. Rul. 79–423, 1979–2 C.B. 386, 1979 WL 50738. It has been contended by plaintiff that the modifications to its vehicles result in chassis with asymmetric configurations. Pl.'s Opp. at 16. Defendant has argued that there are few facts developed regarding the modification and that, in any case, the point is not dispositive of this dispute. *See* Tr. at 22–23. In Revenue Ruling 79–423, 1979 WL 50738, the only issue was

whether the vehicles met the part (C) test because the equipment in question was permanently mounted to the chassis and unrelated to transportation, meeting part (A), and there was no contention that the vehicles had any cargo hauling capacity, meeting part (B). Rev. Rul. 79–423, 1979–2 C.B. 386, 1979 WL 50738. The configuration was therefore dispositive of the dispute. *Id.* In this case, the court agrees with defendant that whether or not the vehicles in question have an asymmetric configuration is not dispositive because of their significant cargo capacities.

The tank erector trucks, however, present a slightly different question. Unlike the sand and cement trucks, the tank erector trucks transport an empty bin. Jt. Stip. Ex. 9 at 14. The mobile machinery in question is the hydraulic arms that load and unload the empty bin. *Id.* If one were to view the bin as an item "incidental" to the function of the machinery, much as the safety equipment mentioned above in the discussion of what cargo would be viewed as "incidental" under part (B) of the test, then part (A) could be met. But the court sees no reason to view an empty bin any differently from a loaded one; the bin is still cargo, and the machinery in question is therefore used to load and unload cargo. Additionally, the parties agree that the trucks are "used to *transport* portable dry material storage units to and from locations." Jt. Stip. Ex. 9 at 16 (emphasis added). The court therefore finds that part (A) of the mobile machinery exception is not met as to the tank erector trucks.

Even if part (A) of the test were met, the court cannot find that part (B) of the test is met by the tank erector trucks. Defendant argues that part (B) is not met because the chassis is "not designed *solely* as [a] carriage[ ] for the work-performing bodies permanently mounted thereon." Def.'s Mot. at 20 (emphasis in original). According to defendant, the truck can carry a substantial removable load, and therefore it cannot qualify under part (B) of the test.

Plaintiff argues that any hauling capacity is merely incidental to the work of the tank erector trucks at the job site. Pl.'s Reply at 18. In making this argument, however, plaintiff focuses not on the tank erector trucks, but on the cargo capacity of the nitrogen pumper trucks, which are discussed separately below. *Id.* As defendant points out, the parties have stipulated that the tank erector truck has a payload capacity of 22,300 pounds of cargo. Def.'s Mot. at 20; Jt. Stip. ¶ 18. By comparison, a fully loaded conical cement truck carries 27,100 pounds and a sand dump truck carries 29,000 pounds of cargo. The tank erector trucks appear, based on stipulated facts, to be dual purpose vehicles. Part (B) does not appear to the court to contemplate an exception for such

vehicles. Treas. Reg. § 48.4041–2(b)(2)(B) ("the chassis has been specially designed to serve *only* as a mobile carriage and mount ... for the particular machinery or equipment involved ....") (emphasis added). Accordingly, the tank erector trucks do not meet part (B) of the mobile machinery exception.

The tank erector trucks cannot meet part (C) of the mobile machinery exception either, even if parts (A) and (B) were met. No modifications are necessary to use the truck as a highway vehicle, because cargo can be loaded on the flatbed behind the hydraulic arms. *See* Jt. Stip. Ex. 9 at 14, Ex. 10 at 11, 12 (pictures of tank erector trucks without the tank, showing a large flatbed on which substantial cargo could be loaded). While this may not be the most economical use of these vehicles, the court believes it is a use sufficient to take the tank erector trucks out of compliance with part (C) of the test.

Because plaintiff's sand dump trucks, conical cement trucks, and tank erector trucks do not satisfy parts (A), (B), or (C) of the test for the mobile machinery exception, the exception is not available. Summary judgment is accordingly GRANTED to defendant on this issue.

c. Nitrogen Pumper Trucks

Defendant concedes that the nitrogen pumper trucks meet part (A) of the mobile machinery exception. Def.'s Mot. at 21 n.24. Defendant argues that the nitrogen pumper trucks fail the part (B) test because they are not designed to serve only as a mobile carriage for the pump mounted on the chassis. Def.'s Mot. at 23. Defendant contends that *Liquid Asphalt Sys., Inc. v. United States,* 555 F.Supp. 1100 (W.D.Mo.1982), supports its position. Def.'s Mot. at 23. In that case, a truck which transported liquid asphalt to a job site was held not to fall within the mobile machinery exception even though there was dispensing equipment permanently mounted on the carriage. Def.'s Mot. at 23 (citing *Liquid Asphalt,* 555 F.Supp. at 1104).

Plaintiff argues that any hauling capacity the nitrogen pumper trucks have is incidental to its function at the well site. Pl.'s Opp. at 32. Plaintiff contends that "if [the nitrogen pumper trucks] were designed to haul liquid

nitrogen economically, it would not have a heavy duty oil field chassis or a high pressure pump, and would have a 5,000 or 8,000 gallon tank customarily seen on liquid transports." *Id.* Because the nitrogen pumper trucks have smaller tanks combined with the job site equipment permanently mounted on the chassis, plaintiff contends that they are "substantially identical" to the acid pumpers found to be exempt by the district court in *Halliburton*, 611 F.Supp. at 1128, and by this court in *Halliburton Co. v. United States*, 4 Cl.Ct. 150, 154 (1983). Pl.'s Opp. at 32.

Defendant's case, *Liquid Asphalt*, involved tankers that were designed to provide roofing contractors, among others, with a more convenient and economical way of bringing hot asphalt to the job site. *Liquid Asphalt*, 555 F.Supp. at 1103. The vehicles arrived at the job site with "large quantities of liquid asphalt" which would then be pumped up to the roof. *Id.* The court found that plaintiff "clearly established that an important aspect of the design of these job tankers is to function as construction equipment on the job site," but also found that the highway transportation function was not incidental. *Id.* Accordingly, the court held that "plaintiff's job tankers are not 'specially designed to serve *only* as a mobile carriage and mount ... for the particular machinery or equipment involved.'" *Id.* at 1104. Because the vehicles were also designed to transport liquid asphalt over the public highways, they did not meet the part (B) test of the mobile machinery exception. *See id.*

The *Halliburton* cases both involved acid pumper trucks to be used at well-sites. *Halliburton*, 611 F.Supp. at 1128; *Halliburton Co.*, 4 Cl.Ct. at 156. The acid pumper trucks were capable of traveling up to 55 miles per hour and did not require special permits to operate on public highways. *Halliburton*, 611 F.Supp. at 1120–21; *Halliburton*, 4 Cl. Ct. at 151. The vehicles carried 1500 gallons of acid, in addition to the job site pumping equipment. *Halliburton*, 611 F.Supp. at 1128. Both the district court and this court found the acid carried by the vehicles to be incidental to the vehicle's design to operate as a piece of mobile machinery. *Id.; Halliburton*, 4 Cl.Ct. at 154. The district court

held that the part (B) test was not met, in large part because there was evidence that the amount of acid carried by the vehicle was insufficient to perform the job. *Halliburton*, 611 F.Supp. at 1128.

The court does not believe that the nitrogen pumper trucks in question fit exactly within the framework articulated by either *Liquid Asphalt* or the *Halliburton* cases. In *Liquid Asphalt*, the court found that the vehicles carried "large quantities" of cargo. 555 F.Supp. at 1103. The district court in *Halliburton* found that 1500 gallons of acid was an "incidental" amount. 611 F.Supp. at 1128. Neither of these extremes is present in this case; the parties agree that the nitrogen pumper truck can haul some cargo, but do not agree as to the importance of that amount. Defendant argues that the nitrogen pumper truck has "substantial payload capacity." Tr. at 25–26. Plaintiff argues that the truck would need a 5,000 or 8,000 gallon tank to haul liquid nitrogen economically. Pl.'s Opp. at 32.

The fact remains, however, that the truck is designed to carry 1,920 gallons of liquid nitrogen over public highways to the job site. Jt. Stip. Ex. 9 at 2. To the extent that the *Liquid Asphalt* and the *Halliburton* courts reflect different interpretations of the language of part (A) of the test, the court agrees with the conclusion in *Liquid Asphalt* that the part (B) test is met when the chassis is designed to serve "only" as a carriage for mobile machinery. *See Liquid Asphalt*, 555 F.Supp. at 1104. Even if, as the court thinks, some incidental cargo capacity is permissible under part (B) of the test, the court cannot find the cargo-carrying capacity here to be "incidental" to the function of the nitrogen pumper trucks as a mobile carriage for the pumper mechanisms. This is not a case of a nook or niche for tools or safety equipment. The regulation does not contemplate an exception when a portion of the vehicle is, as here, *designed* with the purpose of carrying cargo. Therefore the nitrogen pumper trucks do not meet part (B) of the test.

Nor do the nitrogen pumper trucks meet part (C) of the test. No modification is necessary, because the trucks already are used to haul cargo over public highways.

Because the trucks do not satisfy parts (B) or (C) of the mobile machinery exception, the exception is not available. Summary judgment is accordingly GRANTED to defendant on this issue.

### d. Crane Trucks With or Without Tank

 Defendant asserts that the crane trucks "arguably" fail the part (A) test because the small crane can be used for loading and unloading cargo. Def.'s Mot. at 21 n.24. Plaintiff argues that the cranes meet the part (A) test because it can be presumed that they are not used for loading and unloading under Revenue Ruling 75–88, 1975–1 C.B. 341, 1975 WL 34840. Pl.'s Opp. at 32, 34. Plaintiff argues that all the cranes here extend beyond 25 feet in length, just as did the cranes in Revenue Ruling 75–88 that were found to be exempt. *Id.* at 34.

Revenue Ruling 75–88, however, involved cranes sold prior to the enactment of the current regulation in 1977 and addressed the question of whether the cranes were "designed or *primarily* used for loading and unloading trucks upon which they are mounted." Rev. Rul. 75–88 (emphasis added). Cranes under 25 feet were presumed to be used in loading and unloading, and cranes over 25 feet were presumed to be exempt. *Id.* The question for the court under the regulation applicable to this case is whether in fact the crane is used for a function related to transportation, such as loading and unloading. Treas. Reg. § 48.4041–8(b)(2)(i)(A). Therefore, the court finds Revenue Ruling 75–88 unpersuasive in deciding whether the vehicles at issue meet the part (A) test under the post–1977 regulation.

The court cannot determine as a matter of law whether the cranes are used for loading and unloading here. The facts have not been fully developed on this issue, and even though it appears in the parties' joint stipula-

tion that the cranes are being used to load or unload cargo, Jt. Stip. Ex. 10 at 8, this is a factual determination that cannot be made on summary judgment.

Even if the trucks were presumed to meet the part (A) test, they fail both the part (B) test and the part (C) test. Plaintiff argues that the presumption of exemption in Revenue Ruling 75–88 supports the conclusion that any cargo capacity of vehicles with cranes that extend beyond 25 feet is merely incidental. *See* Pl.'s Opp. at 34. Plaintiff also argues that any cargo hauling capacity of its crane trucks should not only be presumed to be incidental, but is in fact merely incidental to its job site function. Pl.'s Opp. at 32–33.[9]

Defendant argues that the crane trucks are designed to transport substantial cargo, which the cranes load and unload. Def.'s Mot. at 23. This contention is supported by the parties' joint stipulation which states that stimulation utility trucks (which have the same chassis design as the crane trucks with and without tanks) "transport[ ] and position[ ] heavy pipe and fittings on large frac jobs." Jt. Stip. Ex. 9 at 10.

The parties have also stipulated that the crane trucks with tanks have a cargo capacity of 48,000 pounds, and the crane trucks without tanks have a cargo capacity of 30,000 pounds. Jt. Stip. ¶ 18. It is true that the trucks have a large crane permanently mounted to the chassis, but the joint stipulation also clearly shows that large amounts of pipe are carried in racks attached to the flatbed. Jt. Stip. Ex. 10 at 8. These trucks are designed as dual purpose vehicles, both to carry a substantial load and to serve as a carriage for the crane. Therefore, the trucks are not designed "to serve *only* as a mobile carriage or mount ... for the particular machinery or equipment involved," as the regu-

9. Plaintiff additionally argues that its crane trucks function in a manner substantially identically to the crane truck found to be exempt in *UEC Equip. Co. v. United States*, 21 Cl.Ct. 244 (1990). Pl.'s Opp. at 30, 32–33. Defendant contends that the disposition in this case is not governed by *UEC*, primarily because the cargo-carrying capacity of the flatbeds of the crane trucks in *UEC* was not litigated. Def.'s Reply at 18–19. The court notes that in *UEC* the only disputed portion of the test that was resolved by

the reported opinion concerned the applicability of part (C). *See UEC*, 21 Cl.Ct. at 246 (finding that those vehicles with certain combinations of chassis modifications were not "highway vehicles" under the regulations); Def.'s Reply at 10. Further, the plaintiff in *UEC* did not present its case on a unit-by-unit approach, but rather used an en-masse approach. 21 Cl.Ct. at 246. Therefore, the court does not see how *UEC* is applicable to the part (B) test.

lation requires. Treas. Reg. § 48.4041–8(b)(2)(i)(B) (emphasis added). The court finds that these cargo capacities are more than merely "incidental." Accordingly, the crane trucks with and without tanks do not meet part (B) of the test.

For the same reason that the crane trucks do not meet part (B) of the test, the crane trucks do not meet part (C) of the test. The crane trucks with or without tank need no modification to carry cargo, and therefore cannot meet the part (C) test.

Because plaintiff's crane trucks with or without tank do not satisfy parts (B) or (C) of the mobile machinery exception, the exception is not available. Summary judgment is accordingly GRANTED to defendant on this issue.

### e. Stimulation Utility Trucks

■ Defendant concedes that the stimulation utility trucks meet part (A) of the test. Def.'s Mot. at 21 n.24. Defendant argues that part (B) of the test is not met because the truck is designed to transport substantial cargo, and that part (C) of the test is not met because that substantial cargo capacity means that no structural modifications are necessary. *Id.* at 22–23.

For the same reasons the court has considered with respect to the crane trucks, the court finds that the stimulation utility trucks do not meet parts (B) or (C) of the test. The cargo capacity of these trucks is 26,000 pounds. Jt. Stip. ¶ 18. The court has determined that "incidental" cargo capacity is capacity to carry such items as tools, clothing, and safety equipment. *See supra* II.B.1. The stimulation utility trucks, by contrast, have large racks mounted on the flatbed to carry heavy pipes and fittings. Jt. Stip. Ex. 10 at 6. Twenty-six thousand pounds cannot, in the court's view, be characterized as incidental. Because the trucks are designed both to serve as a mobile carriage for the crane and to carry a substantial load, they are not designed "to serve *only* as a mobile carriage or mount ... for the particular machinery or equipment involved," as the regulation requires. Treas. Reg. § 48.4041–8(b)(2)(i)(B) (emphasis added).

Because plaintiff's stimulation utility trucks do not satisfy parts (B) or (C) of the mobile machinery exception, the exception is not available. Summary judgment is accordingly GRANTED to defendant on this issue.

### f. Conclusion

With regard to the mobile machinery exception, defendant's motion for partial summary judgment is GRANTED, and plaintiff's cross-motion for partial summary judgment is DENIED.

### 2. Off-highway Use Exception

■ The off-highway use exception is a two-part, conjunctive test. The vehicle must be of special design for a primary function of off-highway transport and that special design must result in substantial limitation or impairment of the use of the vehicles for highway transport:

> A self-propelled vehicle, or a trailer or semi-trailer, is not a highway vehicle if it is (A) specially designed for the primary function of transporting a particular type of load other than over the public highway in connection with construction, manufacturing, processing, farming, mining, drilling, timbering, or other operation similar to any one of the foregoing enumerated operations, and (B) if by reason of such special design, the use of such vehicle to transport such load over the public highways is substantially limited or substantially impaired.

Treas. Reg. § 48.4041–8(b)(2)(ii). The regulation also gives guidance as to how the court should evaluate claims that a vehicle falls within the off-highway use exception, stating:

> For purposes of applying the rule of clause (b) of this paragraph b(2)(ii), account may be taken of whether the vehicle may travel at regular highway speeds, requires a special permit for highway use, is overweight, overheight or overwidth for regular use, and any other relevant considerations. Solely for purposes of determinations under this paragraph (b)(2)(ii), where there is affixed to the vehicle equipment used for loading, unloading, storing, vending, handling, processing, preserving, or otherwise caring for a load transported by the vehicle over the public highways, the functions are

related to the transportation of a load over the public highways even though the function may be performed off the public highways.

Treas. Reg. § 48.4041–8(b)(2)(ii).

██ The application of the off-highway use exception is claimed by plaintiff for the sand dump trucks and conical cement transport trucks.[10] As an initial matter, defendant argues that the off-highway use exception "generally applies to oversized vehicles." Def.'s Mot. at 25. In this case, defendant points out, plaintiff's vehicles have highway-rated chassis and highway tires, do not need any special permits to travel over public highways, and can travel up to 55 miles per hour. Def.'s Reply at 20. For those reasons, defendant argues, the vehicles do not meet the requirements of the exception. *Id.* Defendant argues further that the mere fact that increased operating costs are associated with the trucks does not "substantially impair" their ability to transport a load over the public highway. Def.'s Mot. at 25–26. Defendant quotes the court in *Western Co.*, 699 F.2d 264, which reviewed and upheld a jury verdict denying the off-highway use exception:

> Other features, such as special frame supports and cross-member reinforcements, tandem front axles; and heavy-duty suspension systems, make the vehicles heavier and more expensive than similar commercial vehicles, thereby limiting their payload and increasing their operating costs as compared with exclusively highway vehicles. These features are, however, commonly found in heavy-duty highway trucks. Finally, the vehicles are in most cases engineered to incorporate the off-highway use features into designs acceptable for highway use without special permit. The delays and travel restrictions imposed on the movement of equipment with special permit are thereby avoided.

Def.'s Mot. at 26 (quoting *Western Co.*, 699 F.2d at 267). Defendant argues that the same observations can be made about plain-

tiff's trucks as were made by the court in *Western Co.* The trucks have not been specially designed for off-highway use, and that any special design does not "substantially limit[ ]" or "impair[ ]" their ability to transport loads over the public highway within the meaning of Treas. Reg. § 48.4041–8(b)(2)(ii). Def.'s Mot. at 27–28.

*Western Co.* is an appellate opinion on a trial that involved many of the same facts that are present here on summary judgment. The nature of the work of the plaintiff in *Western Co.*, like the work of plaintiff here, required that its equipment do some travel over difficult terrain. *Western Co.*, 699 F.2d at 266. But over 80% of the mileage traveled by those vehicles was on public highways, traveling to job sites 100 miles or more from the district office. *Id.* Plaintiff's vehicles here generally travel within 200 miles of their home base, logging 80% of their miles on public highways. DPFUF ¶ 13. And just as is the case here, the vehicles in question in *Western Co.* did not need special permits to travel on the public highways. *Western Co.*, 699 F.2d at 267; Jt. Stip. ¶ 19.

But *Western Co.* is not quite as helpful as defendant may suggest. The question of the taxability of the vehicles in *Western Co.* was initially decided by a jury. *Western Co.*, 699 F.2d at 269. The appellate court's review was therefore limited to whether "the facts and inferences point so strongly and so overwhelmingly in favor of one party that reasonable men could not arrive at any verdict to the contrary." *Id.* at 276. Based on the record before it, the appellate court simply found that the jury's conclusion that the vehicles were taxable was not unreasonable. *Id.* *Western Co.*, even if it were precedential, would not be outcome-determinative in this case.

Plaintiff argues that its vehicles are "specially designed to meet the extremes of terrain and weather conditions off road," and therefore do meet the requirements of the exception. Pl.'s Opp. at 46. Plaintiff con-

---

10. In its opposition and cross-motion, plaintiff did not specifically state which vehicles it felt qualified under the off-highway use exception. *See* Pl.'s Opp. at 46 (loads included work performing equipment). In its reply brief, however, plaintiff explicitly limited its argument to the sand dump trucks and conical cement transport trucks. Pl.'s Reply at 24. Accordingly, the court limits its analysis here to the sand dump trucks and conical cement transport trucks.

tends that its vehicles are more costly than similar highway vehicles, can only haul 60–80% of a full load without a permit, and have special discharge devices designed for a particular application at the well site. Pl.'s Reply at 24. Plaintiff argues its trucks are substantially identical to the vehicles found exempt in *Flow Boy, Inc. v. United States*, 83–1 U.S.T.C. ¶ 16,395, 1982 WL 1735 (W.D.Ok.1982), and that the court should come to the same conclusion as to the vehicles in front of it now. *Id.* Further, plaintiff argues that its vehicles are "substantially limited or impaired in the economic sense." Pl.'s Opp. at 46. Because "their utility for hauling [is] substantially limited by cost, operating expense and payload capacity," plaintiff argues, its trucks meet both tests for the off-highway use exception. Pl.'s Reply at 25.

*Flow Boy*, like *Western Co.*, was also decided by a jury. *Flow Boy, Inc. v. United States*, 83–1 U.S.T.C. ¶ 16,395, 1982 WL 1735 (W.D.Ok.1982). In *Flow Boy*, plaintiff argued that its vehicles were specially designed to carry weight above the legal load limit, cost substantially more than highway vehicles without off-highway capacities, and could not economically haul cargo over the public highways. *Id.* On the basis of this argument, the jury found that the vehicles were specially designed for off-highway use, and that special design substantially impaired the vehicle's ability to carry a load over the public highways. *Id.* This decision was affirmed without substantial discussion by the appellate court. 84–1 U.S.T.C. ¶ 16,418, 1984 WL 15513 (10th Cir.1984).

Because neither case relied upon by the parties is either binding or in a closely analogous posture, the court looks to the text of the regulation for guidance in deciding whether plaintiff's vehicles meet part (B) of the test. The regulation directs the court to look at whether the vehicles in question can travel at regular highway speeds, are overweight, or need special permits to operate. Treas. Reg. § 48.4041–8(b)(2)(ii). Here, the parties have stipulated that the sand dump trucks and conical cement transport trucks do not need special permits to operate, Jt. Stip. ¶ 19, and that the trucks can reach speeds up to 55 miles per hour, Def.'s Mot. at

7. Plaintiff has attempted to overcome these facts by stating that while the speed limit may be between 55 and 75 miles per hour where its vehicles operate, in reality most vehicles travel from 70 to 80 miles per hour. Pl.'s App. at 10, ¶ 20. Plaintiff also asserts that the trucks can haul only 60–80% of their full load without a permit, despite their earlier stipulations to the contrary. Pl.'s Reply at 24.

In light of these facts, the court finds that plaintiff's trucks do not qualify under the off-highway use exception. Plaintiff cannot prove that its vehicles were "specially designed for the primary function of transporting a particular type of load other than over the public highway ...." Treas. Reg. § 48.4041–8(b)(2)(ii). Plaintiff's trucks here log 80% of their mileage over public highways. DPFUF ¶ 13. Therefore, the trucks cannot be said to have been specially designed for the extremes of offhighway use; instead, they were specially designed to carry a load over several different types of terrain. Because the trucks were also designed to carry their loads over public highways, part (A) of the offhighway use exception is not met.

Even if plaintiff's trucks could meet the part (A) test, they do not meet the part (B) test. By clearly stating what factors to take into consideration under part (B) of the test, the drafters of the regulation have indicated a purpose to exclude that class of vehicles that can operate off the public highways, but can also be used on the public highways without special permits because they are not too slow, heavy, or wide to do so safely. Plaintiff's sand dump trucks and conical cement trucks fall within this excluded class.

For the foregoing reasons, defendant's motion for summary judgment as to the sand dump trucks and conical cement transport trucks with respect to the off-highway use exception is GRANTED.

C. Substantially Similar Treatment

Plaintiff argues that the court must find its vehicles exempt under the "equality doctrine" as set forth in *Int'l Bus. Machs. Corp. v. United States*, 170 Ct.Cl. 357, 343 F.2d 914 (Cl.Ct.1965). Pl.'s Opp. at 47. Plaintiff ar-

gues that this court in *UEC* and *Utilicorp,* and this court and the district court in the *Halliburton* cases, have held that vehicles similar to those before the court now were exempt from the definition of highway vehicle. Pl.'s Reply at 26. According to plaintiff, "If the government prevails in this proceeding, it would give the competitors of plaintiff (who, with the IRS's blessing are not paying the identical excise tax) a significant competitive advantage over plaintiff." *Id.*

Defendant argues that the reach of *Int'l Bus. Machs.* is very limited and does not apply here. Def.'s Reply at 24. According to defendant, *Int'l Bus. Machs.* only applies where: "(i) two or more taxpayers in direct economic competition have each applied for a ruling and only one has received a favorable ruling; and (ii) the taxpayer denied the favorable ruling is arguing that the Commissioner abused his discretion under section 7805(b) by failing to apply a new legal position only prospectively." *Id.* at 25. Because plaintiff never requested an IRS letter ruling that it was exempt from the excise taxes at issue here, Tr. at 66, defendant argues that it cannot rely on *Int'l Bus. Machs.* for recovery here. Def.'s Reply at 24.

In deciding a slightly different issue, this court recently stated that the scope of *Int'l Bus. Machs.* is as limited as defendant contends. *Vons,* 51 Fed.Cl. at 10 (citing *Knetsch v. United States,* 172 Ct.Cl. 378, 348 F.2d 932, 940 n. 14 (1965)); *Bornstein v. United States,* 170 Ct.Cl. 576, 345 F.2d 558, 564 n. 2 (1965). Under those authorities, plaintiff would be required to show that it applied for a ruling, along with other similarly situated taxpayers, and that it was treated disparately in an abuse of discretion by the Commissioner. Plaintiff here points to several letter rulings that it argues are contrary to the Service's position in respect to the excise taxes for plaintiff's vehicles, Pl.'s Opp. at 47–48, but admits that it did not apply for a letter ruling at the same time its competitors were applying for letter rulings. Tr. at 66. This fact is fatal to plaintiff's *Int'l Bus. Machs.* claim. Because plaintiff did not apply for a letter ruling with respect to its vehicles, it cannot now claim that the Service treated similarly situated competitors differ-

ently. For the foregoing reasons, the court DENIES plaintiff's motion for summary judgment as to the "equality doctrine."

III. Conclusion

For the foregoing reasons, defendant's Motion for Partial Summary Judgment is GRANTED as to the inapplicability of the mobile machinery exception and off-highway use exception to plaintiff's vehicles. Plaintiff's Cross–Motion for Partial Summary Judgment is DENIED. Defendant's Motion for Leave to File Amended Pages of Opening Brief is DENIED.

On or before February 14, 2003, the parties shall file with the court a joint status report, or, if they cannot agree, separate status reports, proposing further proceedings in this matter.

IT IS SO ORDERED.